UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| MMR INTERNATIONAL LIMITED, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | CIVIL ACTION H-11-1188 |
| | § | |
| WALLER MARINE, INC., | § | |
| | § | |
| *Defendant*. | § | |

FINDINGS OF FACT AND CONCLUSIONS OF LAW

Beginning on October 28, 2013, a trial on the merits was heard without a jury before this court. Having considered the evidence and the arguments of the parties, the court makes the following Findings of Fact and Conclusions of Law:

I. FINDINGS OF FACT

1.      In early 2010 Waller Marine, Inc. ("Waller") entered into a contract with Citgo Petroleum Corporation ("Citgo"), whereby Waller agreed to build and deliver two power barges to Citgo for use in Venezuela (the "Barges").

2.      Originally, Waller was to build the Barges entirely in Orange, Texas, and deliver the completed Barges to a prepared basin in Tacoa, Venezuela. Once in Tacoa, the Barges were to be connected to the Venezuelan power grid in order to provide electricity to the nation's capital.

3.      Due to circumstances beyond Waller's control, Waller was required to ship the Barges to Venezuela before they were complete. Additionally, at the time of shipment, the Tacoa basin was not ready to accept the Barges, so Waller had to find a temporary location in Venezuela to dock the Barges and finalize their construction. Waller found a dock owned by Halliburton in Guanta, Venezuela.

4.      The Barges were between 70% - 90% complete when they were transported to Venezuela for their completion.  Upon arrival in Venezuela, the Barges required certain additional electrical, welding, instrumentation, and millwright work before final commissioning.

5.      Waller engaged several subcontractors on the project, including IEC Systems, Inc. ("IEC").  IEC was responsible for overseeing the completion of the electrical instrumentation work on the Barges.  Charles Gilbrech ("Gilbrech") acted as IEC's project manager on the Barges, and Dennis Lawrence ("Lawrence") was the assistant project manager.

6.      In August 2010, Waller and IEC began looking for subcontractors who could provide electrical instrumentation labor and equipment in Venezuela.  MMR International Limited ("MMR") was one of the companies Waller considered to perform the work.

7.      Gilbrech contacted John Courville ("Courville"), Vice President of MMR, and requested MMR's rates and a list of its experience.

8.      On or around August 25, 2010, a meeting was held at the shipyard where the Barges were being constructed in Orange, Texas to discuss the scope of the project and MMR's experience in Venezuela.  Courville, Barry Bastin, and Dante Osteicoechea  attended the meeting on behalf of MMR.  Bastin and Osteicoechea both had previous experience working in Venezuela and were brought to the meeting in order to inform Waller regarding specific labor requirements in Venezuela. Anthony Waller (Vice President and project manager), Steve Trevelino (site project manager), and Brad Wolverton (assistant project manager) attended the meeting on behalf of Waller.  Gilbrech was also present at the meeting.

9.      MMR did not guarantee that it could provide American-quality labor in Venezuela. Anthony Waller assumed Wall would be provided American-quality labor based on MMR's previous experience and clients in Venezuela and its rates.

10.     During the meeting, MMR representatives recommended that Waller allow it to hire an experienced local bilingual superintendent to use as an interface between the Venezuelan workers, Waller, and Waller's other subcontractors. Waller rejected this recommendation.

11.     MMR also recommended that Waller allow it to hire a labor relations attorney to coordinate and interface with labor union workers and union representatives. After initial resistance, Waller agreed to allow MMR to retain a labor relations attorney. Alba Gomez was hired for this position.

12.     Waller's representatives also emphasized that they did not want MMR to provide any supervisory personnel to coordinate between Waller, Waller's subcontractors, and the Venezuelan workers, but that IEC would maintain direct supervision and control over the subcontractors and their employees. Instead, Waller only expected MMR to supply certain personnel and equipment.

13.     Following the meeting, Gilbrech sent Courville an email stating the project would require between 40-60 workers, and they would need to work twelve hours a day, seven days a week. Due to transportation issues, the parties later agreed that the workers would be required to work ten hours a day, seven days a week. Courville also testified that, based on discussions with Gilbrech, he was aware that the project was expected to last two to three months and that the Barges would be completed in Guanta, Puerto La Cruz, Venezuela.

14.     On September 16, 2010, MMR sent Waller Proposal No. P10-41061 ("Proposal"). The Proposal stated that, pursuant to Waller's request, MMR was submitting proposed Time and

Materials ("T&M") rates for labor, equipment, and facilities for the electrical and instrumentation ("E&I") and welding-related activities needed for the Barges in Puerto La Cruz, Venezuela.

15.     The Proposal also referenced and incorporated a list of the classifications and types of MMR-supplied E&I and welding-related personnel and equipment that were available for Waller's use on the Barges.

16.     Additionally, the Proposal contained the following relevant terms: (1) that MMR would document hours worked on a daily basis, and individual weekly timesheets would be submitted to a designated Waller representative for approval at the end of each week; (2) that billings and payments were to be in U.S. Dollars; and (3) that the number of personnel and equipment required would be discussed and agreed to between Waller Marine project management and MMR project management.

17.     On September 22, 2010,  Mike Hammonds ("Hammonds"), Waller's Procurement and Logistics Manager, transmitted purchase order D1919-282 ("Purchase Order") to MMR, incorporating MMR's Proposal.

18.     The Purchase Order required MMR to "assist in the Electrical Completion of the WMI Power Barges in Venezuela" and "mobilize a crew as directed by WMI to the Venezuelan site" for a price "Not to Exceed" $443,468.80.

19.     No clear evidence was presented as to how the Not to Exceed price was calculated.

20.     The Purchase Order did not contain any terms guaranteeing the completion date of the project or the performance of the labor crew.

21.     Anthony Waller, on behalf of Waller, and John Courville, on behalf of MMR, executed the Purchase Order on or about September 23, 2010.

4

22.     Thus, MMR agreed to perform the scope of work for not more than $443,468.80, as expressly set forth in the Purchase Order.

23.     At the time of the execution of the Purchase Order, there were no other oral or written agreements between Waller and MMR, and MMR was aware of the nature and scope of the project based on its discussions with Gilbrech and Waller representatives.

24.     Once work on the Barges began, MMR did not confront any circumstances that were not anticipated by the parties before the work began.

25.     Venezuela is a heavily unionized country.  In each region of the country, there are specific unions that a company must use when it has a specific type of project.

26.     Generally, in order to become an authorized union, the union must register with the Venezuelan Ministry of Labor.  Before arriving in Guanta, MMR performed research of the union registry at the Ministry of Labor.  In Guanta, Puerto La Cruz, Venezuela, where the Barges were located, Maisanta was the registered union.  MMR believed it was required to hire union workers from Maisanta.

27.     There was also a local union known as the Bolivarian Front.  The Bolivarian Front was not officially registered with the national government; however, the mayor of Guanta had issued a decree that all construction projects in Guanta must use members of the Bolivarian Front. Therefore, because of the mayor's decree, all of Waller's subcontractors on the Barges were required to use union workers from the Bolivarian Front.

28.      MMR did not discover the mayor's decree or realize it was required to hire workers from the Bolivarian Front until it arrived at the job site on September 30, 2010, and witnessed the Bolivarian Front union workers protesting at the front gate.

29.     Waller informed MMR that MMR had chosen the wrong union.  MMR began the process to screen and hire workers from the Bolivarian Front union that same day.  A few of the original Maisanta workers hired by MMR, however, remained on the job.  Under Venezuelan labor law, the Maisanta workers could not be terminated from the project until the job was complete or good cause existed for their termination.

30.     Subcontractors were also required to hire a certain majority percentage of local labor union workers in order to comply with Venezuelan labor law.

31.     Waller was aware that MMR was required to use a certain percentage of local labor union workers.

32.     The MMR labor crew, at its peak, consisted of 44% MMR employees, 6% Maisanta union, and 50% Bolivarian Front union.  For its MMR employees, MMR was able to screen, interview, and hire or rehire employees used previously on Venezuelan projects.  Under Venezuelan law, however, MMR was not allowed to screen, conduct background checks, or drug test the labor union workers.  MMR had to accept the workers chosen by the labor union leaders, which largely consisted of unskilled laborers.

33.     The union workers caused numerous problems on the job site.  Evidence showed that on one occasion a union worker was caught sleeping on the job, and on another occasion, an MMR employee was caught stealing a measuring tape.  There were also several protests and work stoppages related to the pay and bonuses of the workers.  Waller's project manager also complained numerous times about MMR's labor crew starting work late and stopping work early.   Additionally, a union employee threatened a Waller employee.  The majority of labor unrest was caused by the few Maisanta union employees.  The work site issues caused some delay in the project.

6

34.     Many of these work disruptions stemmed from payment issues.  A dispute arose regarding a discrepancy between the amount paid by MMR to union workers as compared to the amount paid by other subcontractors.  MMR and other subcontractors were referencing different pay rate schedules related to union workers.  MMR adjusted its pay rate when the problem was brought to its attention.

35.     The evidence showed that MMR timely addressed or resolved each of the work issues that arose on the Barges.  MMR fired several workers on the same day or within days of any reported incidents and consistently communicated with the union leaders regarding labor problems.

36.     Gilbrech and Lawrence, who respectively served as IEC's project manager and assistant project manager, were both satisfied with the performance of the Venezuelan labor supplied by MMR.

37.     One of IEC's responsibilities as supervisor of the MMR-supplied workers was to verify and sign the timesheets for the MMR-supplied workers.

38.     IEC signed the MMR timesheets on a weekly basis, and Gilbrech testified he would not have signed MMR's timesheets if they were inaccurate or if the MMR workers' performance was substandard.

39.     MMR was on the work site from approximately September 30, 2010 to November 5, 2010.  At its peak, MMR had 78 workers on the job site.

40.     Anthony Waller testified that he decided to terminate MMR from the project in early November 2010 because of the numerous problems with the MMR workers.  MMR's termination was effective on November 8, 2010.  Waller believed that terminating MMR would result in the termination of all of the labor union workers employed by MMR.  However, under Venezuelan law,

Waller could not terminate the MMR union employees from the project until its completion or until good cause existed for termination.

41.     Edibarca, an entity formed by Waller's Venezuelan partner Alba Energia, hired all of MMR's former employees except for one.  Edibarca continued to have the same problems with these workers as MMR.  Edibarca was paid in full for its work using the former MMR workers.

42.     Approximately two weeks after MMR began work on the Barges, on October 15, 2010, Courville emailed Hammonds informing him that, based on the current schedule and labor and service requests from Waller, he expected to exceed the Not to Exceed price.  Courville asked what he needed to do in order to increase the Purchase Order price.  Courville also submitted a pro forma invoice projecting MMR's total charges to Waller through the end of October.

43.     The MMR pro-forma invoice estimated that, based upon Waller's actual and then-current usage of MMR labor, materials, and equipment, the charges to Waller through October 31, 2010 would total approximately $782,008.49.

44.     After Courville sent the initial email to Hammonds, Courville again raised the question of increasing the Purchase Order price with Hammonds by email on October 18, 2010.

45.     In this email, Courville further informed Hammonds that the estimated charges Waller owed to MMR through October 17, 2010 had already reached approximately $413,901.

46.     After no response, Courville followed-up with a phone call to Hammonds.  Hammonds stated that he had sent the request to his superiors for approval.

47.     Courville never contacted Anthony Waller regarding the amendment.  Courville never received a response to the request for modification before MMR was terminated from the project.

8

48.     Courville testified that Hammonds told him the amendment would be no problem once the final invoice was submitted.  However, contrary to Courville's sole recollection of this conversation, Hammonds never agreed to modify the Purchase Order by all other accounts. Specifically, following his conversation with Hammonds,  Courville sent an internal email to MMR management onsite in Venezuela.  He stated he needed to "flush" out Waller regarding the amended Purchase Order, meaning he still needed an agreement from Waller to amend the Purchase Order. Mauricio Alucema, MMR's contract administrator for the project, also testified he was unaware of any other agreements or amendments to the Purchase Order.  Even Courville recognized that the Purchase Order had not been amended, but would be "forthcoming."  Finally, Hammonds testified that he did not promise to modify the Purchase Order.  Thus, the court finds that Waller did not promise to modify, agree to modify, or modify the Purchase Order.

49.     Further, in its request to increase the Not to Exceed price, MMR did not offer any additional services or other consideration for raising the Not to Exceed price that it was not already required to provide under the terms of the contract.

50.     MMR sent Waller two invoices for services rendered and equipment provided.  The first invoice was dated November 8, 2010, for $741,228.59, and the second invoice, dated November 18, 2010, was for $213,609.03.  The total amount MMR charged Waller for services and equipment from September 30, 2010 to November 14, 2010 was $954,837.62.

51.     Waller accepted the invoices and told MMR it would review them for payment.  On January 12, 2011, Hammonds wrote to Courville stating Waller had completed the review of the MMR invoices and supporting materials, and he specified 7 separate and detailed points that he wished MMR to address before Waller approved payment.  MMR researched the invoicing

discrepancies noted by Waller.  MMR issued a credit note of $36,852.16, bringing the total invoice amount to $917,985.46.

52.     Waller has not paid MMR on either invoice submitted for payment.

## II.  CONCLUSIONS OF LAW

1.     The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332.

2.     Texas law is applicable in this diversity suit.

Breach of Contract

3.     Under Texas law, the essential elements of a breach of contract action are: (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach. *Smith Int'l, Inc. v. Egle Grp.*, *L.L.C.*, 490 F.3d 380, 387 (5th Cir. 2007) (quoting *Valero Mktg. & Supply Co. v. Kalama Int'l*, *L.L.C.*, 51 S.W.3d 345, 351 (Tex. App.–Houston [1st Dist.] 2001, no pet.)).

4.     Waller and MMR had a valid contract in the form of the Purchase Order.

5.     Under the Purchase Order, MMR was to "assist in the Electrical Completion of the WMI Power Barges in Venezuela" and "mobilize a crew as directed by WMI to the Venezuelan site" for a "Not to Exceed" price of $443,468.80.

6.     An agreement to render performance at a price that shall not exceed a specified amount is valid as an agreement to render the performance at the stated maximum.  *Norton v. Menard Lumber Co.*, 523 S.W.2d 791, 793 (Tex. Civ. App.–San Antonio 1975, no writ).

7.     The Not to Exceed price agreed to by the parties clearly set a maximum price for the project.

10

8.      Thus, MMR agreed to perform this work for a price "Not to Exceed" $443,468.80.

9.      Parties to a contract are free to modify the contract by any manner in which they can form a contract. *Hondo Oil & Gas Co. v. Texas Crude Operator, Inc*., 970 F.2d 1433, 1437 (5th Cir. 1992).

10.     Whether the parties modified the contract depends on the parties' intentions and is a question of fact. *Id.*; *Hathaway v. General Mills, Inc.*, 711 S.W.2d 227, 228-29 (Tex. 1986).

11.     In determining whether the parties had a meeting of the minds concerning a modification of a contract, the focus is on what the parties did and said, not their subjective states of mind. *Arthur J. Gallagher & Co. v. Dieterich*, 270 S.W.3d 695, 702 (Tex. App.–Dallas 2008, no pet.).

12.     Further, a contract modification must satisfy the traditional requirements of a contract, namely there must be a meeting of the minds supported by consideration. *Id.*

13.      Waller did not promise to modify or agree to modify the Purchase Order.  Thus, a modification never occurred because there was no meeting of the minds regarding the terms of a modified Purchase Order.

14.     The rules that govern the sufficiency of consideration for contracts also govern the sufficiency of the consideration for the modification of an existing contract. *Morgan v. Stover*, 511 S.W.2d 362, 365 (Tex. Civ. App.–Eastland 1974, writ ref'd n.r.e.).

15.     When a party agrees to do nothing more than that what he is already bound to do under an existing contract, there is insufficient consideration to support a modification of the contract. *Dieterich*, 270 S.W.3d at 702.  However, there are exceptions to this preexisting duty rule. Specifically, "a promise modifying a duty under a contract not fully performed on either side is

binding if the modification is fair and equitable in view of circumstances not anticipated by the parties when the contract was made." RESTATEMENT (SECOND) OF CONTRACTS § 89 (1981).

16.     Where the original contract was obtained by mistake or where it operates oppressively as a result of a change in circumstances, a modification of the agreement is deemed to be supported by a sufficient consideration. *City of Galveston v. Galveston City R.R. Co.*, 46 Tex. 435, 440 (1877); *Liebreich v. Tyler State Bank & Trust Co.*, 100 S.W.2d 152, 154 (Tex. Civ. App.–Texarkana 1936, writ dism'd w.o.j.); *George W. Baker & Sons v. Lovorn*, 262 S.W. 508, 509-10 (Tex. Civ. App.–Fort Worth 1924, writ ref'd).

17.     MMR did not provide Waller with any additional consideration for the purported modification.  MMR was aware of the scope of the project when it executed the Purchase Order. There were no change of circumstances or surprises justifying a modification of the parties' agreement without additional consideration.

18.     Accordingly, MMR cannot recover for work performed under the Purchase Order more than the Not to Exceed price of $443,468.80.[1]

19.      Failure to pay invoices which are properly due and owing under the terms of a contract constitutes a breach of the contract.  *White Oak Operating Co., L.L.C. v. BLR Constr. Companies, L.L.C.*, 362 S.W.3d 725, 736 (Tex. App.–Houston [14th Dist.] 2011, no pet.); *Peak Technical Services, Inc. v. Land & Sea Eng'g, L.L.C.*, 2011 WL 3902754, *8 (S.D. Tex. 2011). Because it has failed to pay MMR's properly documented invoices for work performed under the contract, Waller is in breach of the contract.

---

[1] In its order dated September 18, 2013 (Dkt. 77), the court previously determined that Waller waived any defense of illegality or claim that this judgment should be paid in Venezuelan Bolivars.

20.     Waller contends it is excused from paying MMR's invoices in their entirety because MMR materially breached the contract by providing deficient and disruptive labor, which caused Waller further expense and delay.  When one party to a contract commits a material breach of that contract, the other party is discharged or excused from further performance. *Mustang Pipeline Co., Inc. v. Driver Pipeline Co., Inc.*, 134 S.W.3d 195, 196 (Tex. 2004); *Allied Capital Partners, L.P. v. Proceed Technical Res., Inc.*, 313 S.W.3d 460, 464 (Tex. App.–Dallas 2010, no pet.).

21.     In determining the materiality of a breach, courts most often consider the extent to which the non-breaching party will be deprived of the benefit that it could have reasonably anticipated from full performance.  *Hernandez v. Gulf Group Lloyds*, 875 S.W.2d 691, 693 (Tex. 1994) (citing RESTATEMENT (SECOND) OF CONTRACTS § 241(a) (1981)).  The less the non-breaching party is deprived of the expected benefit, the less material the breach.  *Id.*

22.     The problems caused by MMR's labor crew do not amount to a material breach of the contract by MMR.  The evidence showed that MMR's labor crew performed in a technically competent manner, and that MMR was not solely responsible or at fault for the work disruptions experienced at the Barges.

23.     This case presents a unique situation wherein MMR was required to operate under Venezuelan labor law.  Venezuelan labor law mandated that a majority of the labor force used on certain construction projects be provided by local labor unions.  Therefore, the hiring, discipline, and termination process was largely out of MMR's control.  The evidence presented shows that the vast majority of disruptions caused on the project occurred due to actions of the labor union workers. Specifically, Waller has presented evidence of discrete instances of work stoppages related to payment issues, employees arriving late or leaving early, sleeping on the job, stealing a measuring

13

tape, and threatening other workers.  While these incidents are obviously disruptive, MMR worked promptly to address and resolve these issues when they arose.

24.     There is no evidence of inadequate or incompetent work performance, in terms of the work that was performed, by the MMR workers, other than the opinion of Brad Wolverton who speculated, without any basis, that the MMR workers were 30% less productive than American-quality workers.  Conversely, MMR's supervisors at IEC unanimously testified that they were satisfied with MMR's workers' performance.

25.     MMR substantially performed under the terms of the Purchase Order before it was terminated five weeks later by Waller.   MMR rendered services and provided equipment which benefitted Waller, for which it has not been paid by Waller.  Waller remains in breach of the agreement and is not excused from its performance on the basis of MMR's material breach.

26.     For many of the same reasons, Waller also has not demonstrated that MMR was in breach of the agreement.  MMR performed in a manner consistent with the terms of the agreement. The Purchase Order did not include terms which guaranteed a completion date for the project or performance of the workers.  Under the circumstances, the court does not find that MMR breached the agreement, and Waller's breach of contract claim fails.

Unjust Enrichment

27.     MMR also, alternatively, seeks recovery for the full amount of its invoices under the equitable theory of unjust enrichment.

28.     Unjust enrichment occurs when the person sought to be charged has wrongfully secured a benefit or has passively received one which it would be unconscionable to retain.  *Tex. Integrated Conveyor Sys., Inc. v. Innovative Conveyor Concepts, Inc*., 300 S.W.3d 348, 367 (Tex.

App.–Dallas 2009, pet. denied).   A party may recover under the unjust enrichment theory when one person has obtained a benefit from another by fraud, duress, or the taking of undue advantage. *Heldenfels Bros., Inc. v. City of Corpus Christi*, 832 S.W.2d 39, 41 (Tex. 1992).

29.     "Unjust enrichment is not a proper remedy merely because it might appear expedient or generally fair that some recompense be afforded for an unfortunate loss to the claimant, or because the benefits to the person sought to be charged amount to a windfall."  *Id.* at 42.

30.     MMR has not presented evidence that Waller obtained a benefit by fraud, duress, or the taking of undue advantage of MMR.  MMR agreed to assist in the completion of the electrical work on the Barges for a fixed amount.  MMR failed to secure an amendment of the Purchase Order before continuing work on the Barges in excess of the Not to Exceed price.  Waller's actions in relation to the MMR's request for a modification do no amount to fraud, duress, the taking of undue advantage.  Without such evidence, MMR cannot recover on its unjust enrichment claim.  *Peak Technical Services, Inc. v. Land & Sea Eng'g, L.L.C.*, 2011 WL 3902754, *8 (S.D. Tex. 2011); *Johnson v. MHSB Enterprises, L.L.C.*, 2004 WL 2247411, *3 (Tex. App.–Austin 2004, pet. denied).

Quantum Meruit

31.     Alternatively, MMR seeks to recover its charges for the labor and equipment that it supplied to Waller pursuant to the doctrine of quantum meruit.

32.     In Texas, quantum meruit "is founded [on] the principle of unjust enrichment." *Bashara v. Baptist Mem'l Hosp. Sys*., 685 S.W.2d 307, 310 (Tex. 1985).  Quantum meruit is based upon the promise implied in law to pay for beneficial services rendered and knowingly accepted. *Air Conditioning, Inc. v. L.E. Travis & Sons, Inc.*, 578 S.W.2d 554, 556 (Tex. Civ. App.–Austin 1979, no writ).

33.     Recovery under quantum meruit requires that: (1) valuable services and/or materials were furnished, (2) to the party sought to be charged, (3) which were accepted by the party sought to be charged, and (4) under such circumstances as reasonably notified the recipient that the plaintiff, in performing, expected to be paid by the recipient. *Heldenfels Bros*., 832 S.W.2d at 41.

34.     Generally, a plaintiff cannot recover in quantum meruit if an express contract exists covering the services or materials furnished. *Murray v. Crest Constr., Inc.*, 900 S.W.2d 342, 345 (Tex. 1995). However, the Texas Supreme Court has enumerated a few instances where damages in quantum meruit might be available despite an express contract. *Truly v. Austin*, 744 S.W.2d 934, 936-37 (Tex. 1988). A plaintiff may be able to recover if: (1) plaintiff partially performed but the defendant's breach kept the plaintiff from completing performance; (2) plaintiff only partially performed a unilateral contract that imposed no legal obligations on the plaintiff and, thus, the plaintiff did not breach; and (3) plaintiff breached a construction or building contract, but partially performed entitling him to the reasonable value of services less any damages suffered by the defendant. *Id.*

35.     These exceptions are inapplicable. First, Waller's breach did not prevent MMR from completing performance. It is undisputed that Waller had every right to terminate the contract with MMR. Second, the contract was not a unilateral agreement, and third, the court has already found that MMR did not breach the contract.

36.     Moreover, MMR's quantum meruit claim also fails because it did not present sufficient evidence as to the reasonable value of the services rendered and materials provided to Waller. Under Texas law, a party seeking to recover on a claim of quantum meruit must introduce evidence on the correct measure of damages, which is the reasonable value of work performed or

16

materials furnished. *M.J. Sheridan & Son Co., Inc. v. Seminole Pipeline Co.*, 731 S.W.2d 620, 625 (Tex. App.–Houston [1st Dist.] 1987, no writ).   A claim in quantum meruit does not proceed upon the contract for the contract price, but proceeds independently of the contract to recover the reasonable value of the services rendered or materials furnished. *Air Conditioning, Inc. v. L.E. Travis & Sons, Inc.*, 578 S.W.2d 554, 556 (Tex. Civ. App.–Austin 1979, no writ) (distinguishing proof required for contract damages versus quantum meruit damages); *Four Points Bus., Inc. v. Rojas*, 2013 WL 4676314, *4 (Tex. App.–Houston [1st Dist.] 2013, no pet. hist.).

37.     The only evidence offered by MMR as to the value of its services and materials were the invoices submitted to Waller.   While the invoices may constitute some evidence of value, the invoices alone are insufficient to show that the amounts charged represent the reasonable value of the services and materials. *Brender v. Sanders Plumbing, Inc.*, 2006 WL 2034244, *5 (Tex. App.–Fort Worth 2006, pet. denied) (noting that proof of amounts charged alone may not satisfy a showing of reasonableness).   In the cases relied upon by MMR, the courts considered the invoices or amounts charged as some evidence of reasonableness, but additional evidence was also presented to support the finding of reasonableness. *See E&A Utilities, Inc. v. Joe*, 2010 WL 2901711, *8 (Tex. App.–Houston [14th Dist.] 2010, no pet.) (in addition to invoices, plaintiff's testimony that $6,000 was a "fair amount" for work performed constituted sufficient evidence of reasonable value of work to support jury's verdict in favor of quantum meruit claim); *Elec. Wire & Cable Co. v. Ray*, 456 S.W.2d 260, 263 (Tex. Civ. App.–Houston [14th Dist.] 1970, writ ref'd n.r.e.) (contract price in addition to testimony that the price charged for services was reasonable was sufficient evidence relative to the reasonable value of the services). *Cf. Montclair Corp. v. Earl N. Lightfoot Paving*

*Co., Inc.*, 417 S.W.2d 820, 831 (Tex. Civ. App.– Houston 1967, writ ref'd n.r.e.) ("Certainly the contract price is evidentiary of the reasonable value of what is furnished.").

38.     Recently, Texas courts have clearly required specific evidence independent of the contractual damages to support a showing of reasonable value for a damage claim in quantum meruit.  *See Rojas*, 2013 WL 4676314, *5 (testimony offered regarding the specific "value of each task as well as the additional work he performed as a whole"); *LTS Group, Inc. v. Woodcrest Capital, L.L.C.*, 222 S.W.3d 918, 921 (Tex. App.–Dallas 2007, no pet.) (testimony regarding fees charged for services is not evidence of reasonable value of the work performed and materials furnished); *Vinsko v. ITT Educ. Services, Inc.*, 2003 WL 1648173, *15 (Tex. App.–Dallas 2003, pet. denied) ("While Vinsko produced evidence of his standard charges under an employment contract, he produced no evidence that these charges were the reasonable value of any services rendered to ITT . . ..").

39.     Because MMR has not sustained its burden showing the reasonable value of its services and materials, MMR is limited to the amount owed under the contract of $443,486.80.

<u>Negligent Hiring, Supervision, Training, & Retention</u>

40.     Waller also asserts a counterclaim for negligent hiring, supervision, training, and retention against MMR based on the alleged deficient and disruptive labor force employed by MMR for the project in Venezuela.

41.     While the court does not find that MMR acted negligently in the performance of its duties under the contract based on the labor requirements under Venezuelan law, the court need not address this issue because the negligence claim asserted by Waller is barred by the economic loss rule.

42.     The economic loss rule precludes recovery in tort where a plaintiff's only injury is an economic loss to the subject of a contract. *Sw. Bell Tel. Co. v. DeLanney*, 809 S.W.2d 493, 495 (Tex. 1991).  This rule restricts contracting parties to contractual remedies for economic losses, even when the breach might reasonably be viewed as a consequence of a contracting party's negligence. *Lamar Homes, Inc. v. Mid-Continent Cas. Co.*, 242 S.W.3d 1, 12-13 (Tex. 2007); *Acad. of Skills & Knowledge, Inc. v. Charter Sch., USA, Inc.*, 260 S.W.3d 529, 541 (Tex. App.–Tyler 2008, pet. denied).  The rule applies when the nature of the injury is the subject of the contract itself.  *Id.* at 541.

43.     Waller's assertion that MMR was negligent in the hiring, training, supervision, and retention of its labor crew in Venezuela strikes at the heart of the contract in this case.  The Purchase Order required that MMR "mobilize a crew as directed by WMI to the Venezuelan site."  Waller's contention that MMR performed this contractual obligation in a negligent manner, and therefore caused Waller economic losses, falls squarely within the economic loss rule.

44.     Waller is confined to contractual remedies in this case, and cannot maintain its claim for negligence.

Attorney's Fees and Costs

45.     In diversity cases, state law controls both the award of and the reasonableness of attorney's fees awarded. *See Mathis v. Exxon Corp.*, 302 F.3d 448, 461 (5th Cir. 2002).

46.     As the prevailing party, MMR is entitled to attorney's fees under Chapter 38 of the Texas Civil Practice and Remedies Code.  To recover attorney's fees under Chapter 38, a party must (1) prevail on a cause of action for which attorney's fees are recoverable, and (2) recover damages.  Tex. Civ. Prac. & Rem. Code § 38.001.

47.     In determining the reasonableness of attorney's fees, courts consider the following factors:  (1) the time and labor involved; (2) the nature and complexities of the case; (3) the amount of money or the value of the property or interest involved; (4) the extent of the responsibilities assumed by the attorney; (5) whether other employment is lost by the attorney because of the undertaking; (6) the benefits resulting to the client from the services; (7) the contingency or certainty of compensation; and (8) whether the employment is casual or for an established or constant client. *See, e.g., Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 818 (Tex. 1997); *Lamajak, Inc. v. Frazin*, 230 S.W.3d 786, 797 (Tex. App.–Dallas 2007, no pet.).

48.     According to the post-trial affidavit and submissions of its counsel, MMR's reasonable and necessary attorney's fees and costs in this case attributable to its breach of contract claim total $289,925.77 (fees of $242,183.00 and expenses of $47,742.77) for services expended through the end of trial.

49.     MMR is also entitled to the following conditional award of attorney's fees from Waller in the following circumstances: (1) $25,000 in the event Waller files an appeal to the Fifth Circuit Court of Appeals that does not result  in a reversal of the judgment obtained in this action, and (2) $40,000 for making and/or responding to a petition for certiorari to the United States Supreme Court that does not result in a reversal of the judgment obtained in this case.

50.     In addition, MMR may submit a formal Bill of Costs seeking recovery for any costs not addressed or awarded herein as permitted under 28 U.S.C. § 1920.

Interest

51.     In a diversity action, Texas law governs the determination of prejudgment interest. *Bartholomew v. CNG Producing Co.,* 832 F.2d 326, 330–31 (5th Cir. 1987) (state law governs the

20

award of prejudgment interest when state law provides for prejudgment interest as a substantive right).  Prejudgment interest accrues on the amount of the judgment during the period beginning on the earlier of: 1) the 180th day after the date the defendant receives written notice of a claim; or 2) the date the suit is filed, and ending on the day preceding the date judgment is rendered.  *Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 530 (Tex. 1998).  Prejudgment interest is computed as simple interest.  *Id.*  As of the date of this judgment, the prevailing prejudgment interest rate under Texas law is 5% per annum[2] and accrues through the date preceding the day judgment is rendered.  *See* TEX. FIN. CODE § 304.003.

52.     MMR is entitled to collect prejudgment interest at the rate of 5% from April 1, 2011 through the date preceding the day judgment is rendered.  Such prejudgment interest shall apply to MMR's principal damages, as well as MMR's attorney's fees that MMR has paid before the entry of judgment.  *Nova Cas. Co. v. Turner Constr. Co.*, 335 S.W.3d 698, 706 (Tex. App.–Houston [14th Dist.] 2011, no pet.).

53.     Even in a diversity case, federal law applies to an award of postjudgment interest.  *See Travelers Ins. Co. v. Liljeberg Enterprises, Inc.*, 7 F.3d 1203, 1209 (5th Cir. 1993) ("[A] court with diversity jurisdiction awards prejudgment interest according to state law, . . . but calculates postjudgment interest according to the federal rate.").  The applicable federal interest rate for the calendar week preceding the date of judgment is 0.13% per annum.[3]  *See* 28 U.S.C. § 1961(a).

---

[2]  The current rate is published by the Office of Consumer Credit Commissioner at http://www.occc.state.tx.us/pages/int_rates/Index.html.  For the period December 1, 2013 to December 31, 2013, the prevailing judgment interest rate is 5%.

[3]  This rate is equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the week ending November 29, 2013.  *See* 28 U.S.C. § 1961(a) (specifying the source of the prevailing federal judgment interest rate); *Selected Interest*

MMR is awarded postjudgment interest from the date of this order until the date the judgment is paid pursuant to 28 U.S.C. § 1961(a) at the statutory rate.

54.     Based on the above, the Court concludes that MMR is entitled to judgment in the amount of $443,468.80, in addition to attorney's fees, costs, and interest as detailed herein.

To the extent that any Conclusion of Law constitutes a Finding of Fact, the Court hereby adopts it as such.

The court will enter a separate Final Judgment contemporaneously herewith consistent with these Findings of Fact and Conclusions of Law.

IT IS SO ORDERED.

Signed at Houston, Texas on December 10, 2013.

Gray H. Miller
United States District Judge

_____

*Rates*, Fᴇᴅ. Rᴇsᴇʀᴠᴇ Bᴅ. ᴏғ Gᴏᴠᴇʀɴᴏʀs, 1 (last accessed Dec. 4, 2013), http://www.federalreserve.gov/releases/h15/current/h15.pdf.